OA 91  Criminal Complaint

# United States District Court



| NORTHERN | DISTRICT OF | CALIFORNIA |

**FILED** FEB 2 9 2008

RICHARD W. WIEKING
CLERK U.S. DISTRICT COURT,
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES OF AMERICA
V.

ANTHONY TROY VERDUCCI

CRIMINAL COMPLAINT

Case Number: 4 - 0 8 - 7 0 1 1 1   WDB

(Name and Address of Defendant)

I, the undersigned complainant being duly sworn state that the following is true and correct to the best of my knowledge and belief. On or about **February 26, 2008** in **Contra Costa** County, in the **Northern** District of **California** defendant(s) did,

_(Date)_

(Track Statutory Language of Offense)

knowingly and intentionally distribute a Schedule II controlled substance, namely, a mixture and substance containing a detectable amount of methamphetamine

in violation of Title **21** United States Code, Section(s) **841(a)(1)**

I further state that I am a(n) **Special Agent for the Federal Bureau of Investigation** and that this complaint is based on the following facts:

**See attached affidavit.**

**NO BAIL ARREST WARRANT REQUESTED.**

Continued on the attached sheet and made a part hereof:  ☒ Yes  ☐ No

Approved
As To
Form: James C. Mann
AUSA

Lesline S. Wimbley, Special Agent
Name/Signature of Complainant

Sworn to before me and subscribed in my presence,

**February 28, 2008**
Date

**NANDOR J. VADAS**

Honorable ~~Maria-Elena James~~   U.S. Magistrate Judge
Name & Title of Judicial Officer

at **San Francisco, California**
City and State

Signature of Judicial Officer

Document No.

District Court
Criminal Case Processing

AO 257 (Rev. 6/78)

| DEFENDANT INFORMATION RELATIVE TO A CRIMINAL ACTION - IN U.S. DISTRICT COURT |
|---|

**BY:** ☑ COMPLAINT ☐ INFORMATION ☐ INDICTMENT ☐ SUPERSEDING

Name of District Court, and/or Judge/Magistrate Location
**NORTHERN DISTRICT OF CALIFORNIA**

─── **OFFENSE CHARGED** ───

VIOLATION: 21 U.S.C. Section 841(a)(1), Distribution of Methamphetamine.

☐ Petty
☐ Minor
☐ Misde-meanor
☑ Felony

PENALTY:
See attachment.

─── **DEFENDANT - U.S.** ───

▶ ANTHONY TROY VERDUCCI

DISTRICT COURT NUMBER

─── **PROCEEDING** ───

Name of Complaintant Agency, or Person (&Title, if any)
Federal Bureau of Investigation

☐ person is awaiting trial in another Federal or State Court, give name of court

☐ this person/proceeding is transferred from another district per (circle one) FRCrP 20, 21 or 40. Show District

☐ this is a reprosecution of charges previously dismissed which were dismissed on motion of:
  ☐ U.S. Att'y ☐ Defense

☐ this prosecution relates to a pending case involving this same defendant

☐ prior proceedings or appearance(s) before U.S. Magistrate regarding this defendant were recorded under

SHOW DOCKET NO.

MAGISTRATE CASE NO.

Name and Office of Person Furnishing Information on THIS FORM
JOSEPH P. RUSSONIELLO
☑ U.S. Att'y ☐ Other U.S. Agency

Name of Asst. U.S. Att'y (if assigned) James C. Mann, AUSA

─── **DEFENDANT** ───

**IS NOT IN CUSTODY**

1) ☐ Has not been arrested, pending outcome this proceeding. If not detained give date any prior summons was served on above charges ▶

2) ☑ Is a Fugitive

3) ☐ Is on Bail or Release from (show District)

**IS IN CUSTODY**

4) ☐ On this charge

5) ☐ On another conviction

6) ☐ Awaiting trial on other charges } ☐ Fed'l ☐ State

If answer to (6) is "Yes", show name of institution

Has detainer been filed? ☐ Yes ☐ No } If "Yes" give date filed _____ Month/Day/Year

DATE OF ARREST _____ Month/Day/Year

Or... if Arresting Agency & Warrant were not

DATE TRANSFERRED TO U.S. CUSTODY ▶ _____ Month/Day/Year

☐ This report amends AO 257 previously submitted

─── **ADDITIONAL INFORMATION OR COMMENTS** ───

PROCESS:
☐ SUMMONS ☐ NO PROCESS* ☑ WARRANT Bail Amount: NO BAIL.

If Summons, complete following:
☐ Arraignment ☐ Initial Appearance
Defendant Address:

*Where defendant previously apprehended on complaint, no new summons or warrant needed, since Magistrate has scheduled arraignment

Date/Time: _____

Before Judge: _____

Comments:

## ATTACHMENT TO PENALTY SHEET FOR ANTHONY TROY VERDUCCI

21 U.S.C. §§ 841(a)(1), Distribution Of A Schedule II Controlled Substance (Methamphetamine).

*Depending upon the weight and/or purity of the methamphetamine and whether an 851 Information alleging prior felony narcotics conviction is filed:*

| | | |
|---|---|---|
| (1) | Imprisonment: | Possible Maximum Life Imprisonment |
| | | Possible Mandatory Minimum 5, 10, or 20 Years Imprisonment |
| (2) | Fine: | Possible Maximum $8,000,000 |
| (3) | Supervised Release: | Possible Maximum Lifetime |
| | | Possible Mandatory Minimum 4, 5, 8, or 10-Years |
| (4) | Special Assessment: | $100.00 |

NORTHERN DISTRICT OF CALIFORNIA     )
                                     ) ss:
COUNTY OF SAN FRANCISCO              )

**A F F I D A V I T**

I, Lesline S. Wimbley, Special Agent of the Federal Bureau of Investigation, being duly sworn, hereby declare as follows:

**I.     INTRODUCTION**

1.     I am a Special Agent of the Federal Bureau of Investigation ("FBI") and have been so employed since April 2005. Currently, I am assigned to the Violent Crimes and Major Offender Squad at the Oakland Resident Agency, San Francisco Field Office, where my responsibilities involve the investigation of gangs and narcotics. During my tenure in the FBI, I have been involved in investigations of gang-related narcotics traffickers. I have participated in physical and electronic surveillance and undercover narcotics transactions, executed search warrants, and reviewed recorded conversations of drug traffickers. I have attended training regarding the criminal investigation of narcotics trafficking. I have consulted with other Special Agents of the FBI and Narcotics Detectives as part of my investigation and prior to submitting this affidavit. As a federal agent, I am authorized to investigate violations of laws of the United States and am a law enforcement officer with authority to execute warrants issued under the authority of the United States.

2.     The statements contained in this affidavit are based on information provided to me by law enforcement officers as well as my training, experience, and knowledge of this investigation. Because this affidavit is being submitted for the limited purpose of securing search warrants, a criminal complaint, and an arrest warrant, I have not included each and every fact known to me concerning this investigation. I have set forth only those facts that I believe are necessary to establish probable cause to believe that evidence, fruits, and instrumentalities of violations of 21 U.S.C. §§ 846 (conspiracy to distribute and possess with intent to distribute methamphetamine), 21 U.S.C. § 841(a)(1) (distribution and possession with intent to distribute methamphetamine), and 21 U.S.C. § 843(b) (use of a communications facility to facilitate

1    narcotics trafficking) will be found at the following locations: (1) 2112 Camelia Court, Pittsburg,

2    California; (2) 1993 tan Jeep, California License Plate 6AUE796; (3) 2001 green Toyota Camry,

3    California License Plate 4XFW881; and (4) Sprint Mobile Telephone, number 925-584-9081,

4    IMSI 316010022121380. I have also set forth only those facts that I believe are necessary to

5    establish probable cause to believe that ANTHONY TROY VERDUCCI distributed a mixture

6    and substance containing a detectable amount of methamphetamine in violation of 21 U.S.C. §

7    841(a)(1) on or about February 26, 2008.

8    **II.**    **PURPOSE OF AFFIDAVIT**

9        3.     This affidavit is being submitted in support of an application for a warrant to

10    search 2112 Camelia Court, Pittsburg, California ("SUBJECT PREMISES"). The SUBJECT

11    PREMISES is the residence of ANTHONY TROY VERDUCCI, aka TONY VERDUCCI. I

12    believe VERDUCCI uses the SUBJECT PREMISES to store narcotics and other evidence, fruits,

13    and instrumentalities of narcotics trafficking, and that therefore those items will be found at the

14    SUBJECT PREMISES. Specifically included in this application is authorization to search any

15    outbuildings or sheds and any vehicles, boats, or trailers located on the SUBJECT PREMISES.

16        4.     This affidavit is also being submitted in support of an application for a warrant to

17    search two vehicles: (1) a 1993 tan Jeep, California License Plate 6AUE796 ("TAN JEEP") and

18    (2) a 2001 green Toyota Camry, California License Plate 4XFW881 ("GREEN TOYOTA"). I

19    believe VERDUCCI uses these two vehicles to store and transport evidence, fruits, and

20    instrumentalities of narcotics trafficking, and therefore those items will be found in the TAN

21    JEEP and the GREEN TOYOTA.

22        5.     This affidavit is also being submitted in support of an application for a warrant to

23    search the Sprint Mobile Telephone, number 925-584-9081, IMSI 316010022121380

24    ("SUBJECT MOBILE PHONE"). I believe VERDUCCI uses the SUBJECT MOBILE PHONE

25    to communicate regarding narcotics trafficking and that the SUBJECT MOBILE PHONE will

26    contain evidence, fruits, and instrumentalities of narcotics trafficking, and that therefore those

27    items will be found in the SUBJECT MOBILE PHONE.

28        6.     This affidavit is also submitted in support of a criminal complaint and arrest

1  warrant charging ANTHONY TROY VERDUCCI with distribution of a mixture and substance

2  containing a detectable amount of methamphetamine in violation of 21 U.S.C. § 841(a)(1).

3      7.      This affidavit is organized into the following sections, all of which are intended to

4  establish probable cause to search the requested locations for the items to be seized:

5  (I) Introduction; (II) Purpose of Affidavit; (III) Probable Cause; (IV) Premises to be Searched;

6  (V) Knowledge, Training, and Experience Regarding Narcotics Trafficking; (VI) Items to be

7  Seized; (VII) Conclusion; and (VIII) Request to Seal.

8  **III.    PROBABLE CAUSE**

9      **A.    Investigative Background.**

10     8.      The investigation that is the subject of this affidavit has focused on narcotics

11  trafficking and gang-related crime in the areas of Bay Point and Pittsburg, California. This

12  investigation is being conducted jointly by several law enforcement agencies including the FBI,

13  the Contra Costa County Sheriff's Office ("CCCSO"), and the Concord Police Department

14  ("CPD"). The facts set forth in this affidavit are known to me as a result of my personal

15  participation in this investigation, information from cooperating witnesses, reports made to me

16  by other law enforcement agents, physical surveillance observations, and review of relevant

17  business and public records.

18     **B.    Criminal History Of ANTHONY TROY VERDUCCI.**

19     9.      The subject of this portion of the investigation is ANTHONY TROY

20  VERDUCCI. I have reviewed a criminal history report for VERDUCCI, date of birth, July 2,

21  1966, which indicates that VERDUCCI has a 1988 felony conviction for the transportation or

22  sale of a controlled substance, and a 2001 felony conviction for manufacturing controlled

23  substances and possession of a controlled substance for sale.

24     **C.    Cooperating Source.**

25     10.     In December 2007, I, and other agents and detectives, participated in the arrest of

26  an individual for violations of narcotics and counterfeiting laws. After his/her arrest, this

27  individual immediately began cooperating with the FBI and CPD. No formal charges have been

28  filed against this individual in state or federal court as a result of the aforementioned

1   investigation.  No promises have been made to this individual regarding a reduced sentence, but
2   this individual has been told that his/her efforts would be detailed to the United States Attorney's
3   Office.  I have told this individual that he/she should expect to be charged for crimes he/she
4   committed prior to his/her cooperation.  With the exception of expenses for his/her phone bill
5   and a new phone, this individual is not being paid for his/her cooperation.  The total amount
6   being paid for these expenses is $300.  I believe this individual is cooperating solely in hopes of
7   receiving a lesser sentence in connection with the pending narcotics and counterfeiting
8   investigation.

9       11.    On February 25, 2008, I examined this individual's criminal history.  The history
10  includes a 1997 conviction for a felony violation of California Health and Safety Code Section
11  11377, and numerous arrests for narcotics-related offenses, receipt of stolen property, and
12  making fictitious checks.  On February 27, 2008 at 3:45 a.m., this individual was arrested for
13  grand theft and possession of stolen property in Alameda County.  According to police reports
14  regarding the incident, witnesses saw two suspects, including the Cooperating Source, looking
15  into windows of parked cars and a house on Hoover Avenue in Oakland, California.  The same
16  witnesses saw the two suspects removing items from the side of the house on Hoover Avenue.
17  When officers arrived at the scene and stopped the van driven by the Cooperating Source, the
18  officers discovered floral pots, pumps, pipe fittings, and tools in the van, which were apparently
19  stolen from the backyard or storage area of the house on Hoover Avenue.

20      12.    I believe this individual, hereinafter referred to as "CS," has provided accurate and
21  reliable information during this investigation.  Although, after agreeing to cooperate with law
22  enforcement, the CS has purchased methamphetamine from VERDUCCI without law
23  enforcement present and against specific instructions from law enforcement, he/she has told me
24  when he/she has done so.  Additionally, although the CS has trouble recalling exact dates of
25  narcotics transactions with VERDUCCI and/or the exact amounts he/she purchased from
26  VERDUCCI, I believe this is due in part to the large number of times the CS has purchased
27  methamphetamine from VERDUCCI.  In the course of this investigation, I have been able to
28  verify much of the information that the CS has provided to me.  Additionally, the CS has made

                                        4

1  controlled purchases of methamphetamine from VERDUCCI during this investigation; and, the

2  CS' descriptions of those transactions have been consistent with audio and visual recordings of

3  those transactions, as well as surveillance conducted by law enforcement of those transactions.

4      **D.**   **Background Information Provided By The CS.**

5      13.    Since the arrest of the CS, I have been present on at least five occasions when the

6  CS has been debriefed regarding VERDUCCI. During those debriefings, the CS stated that prior

7  to his/her arrest in December 2007, he/she had purchased methamphetamine from VERDUCCI

8  as many as 75 times during approximately the last eight months. I showed the CS a California

9  Driver's License photograph of ANTHONY TROY VERDUCCI. The CS indicated that the

10  person depicted in the photograph was the same person he/she knew as TONY VERDUCCI.

11      14.    The CS admitted that he/she purchased approximately a quarter-ounce of

12  methamphetamine from VERDUCCI for approximately $400 on or about Monday, February 18,

13  2008. The CS admitted that he/she had no prior approval from law enforcement to do so, and

14  that law enforcement was not present for this transaction. According to the CS, the transaction

15  took place at a golf course near VERDUCCI's house. The CS told me that on at least one other

16  occasion since his/her arrest and agreement to cooperate in December 2007, he/she has purchased

17  methamphetamine from VERDUCCI without law enforcement's approval or presence.

18      15.    The CS stated that VERDUCCI lives at the SUBJECT PREMISES. The CS

19  stated that he/she has been to the SUBJECT PREMISES on over 15 occasions. The CS stated

20  that on all of those occasions, he/she has purchased methamphetamine from VERDUCCI. The

21  last time the CS purchased methamphetamine from VERDUCCI inside the SUBJECT

22  PREMISES was in late November 2007. The CS believes that on that occasion, he/she

23  purchased approximately $900 worth of methamphetamine. On the occasions VERDUCCI sold

24  methamphetamine to the CS while the CS was inside the SUBJECT PREMISES, the CS believes

25  VERDUCCI went to the garage of the residence to retrieve the methamphetamine. The CS

26  believes the methamphetamine was well hidden inside the garage because it took VERDUCCI

27  several minutes to come out of the garage with the methamphetamine. The CS has seen large

28  stacks of clothes in the garage. The CS has seen VERDUCCI weighing and packaging

1    methamphetamine inside the SUBJECT PREMISES. The CS said that on another 15 occasions

2    he/she has purchased methamphetamine from VERDUCCI directly in the front yard of the

3    SUBJECT PREMISES.

4         16.    According to the CS, VERDUCCI has taken steps to make the SUBJECT

5    PREMISES very difficult to break into. The front door has a door club that attaches at the

6    doorknob and braces against the floor. The CS stated that VERDUCCI is very consistent about

7    using the door club; he/she has seen VERDUCCI rush people in through the front door so he can

8    reattach the door club to the front door. Additionally, the CS stated he/she has seen five cars in

9    the backyard of the SUBJECT PREMISES. In between the cars, there are boards with nails

10   through them like spike strips. Also between the cars are large traps like those used for catching

11   large animals. The CS stated that these "bear traps" are not difficult to see, but are placed so that

12   a person would step on them if they were in the backyard and were not looking for them. The CS

13   stated there is also a shed in the backyard of the SUBJECT PREMISES. According to the CS,

14   VERDUCCI took steps to make the SUBJECT PREMISES more difficult to break into after

15   VERDUCCI was involved in a shooting at the SUBJECT PREMISES in September 2007.

16        17.    According to the CS, in the kitchen of the SUBJECT PREMISES, VERDUCCI

17   installed a compartment on the right side of the sink. The CS has seen VERDUCCI keep a

18   digital scale he uses for weighing narcotics inside the compartment. The CS stated that the side

19   of the cabinet has small marks where he/she believes individuals have pried open the cabinet

20   with a knife.

21        18.    The CS has seen VERDUCCI carrying a Sig Sauer semi-automatic pistol since the

22   shooting at VERDUCCI's house approximately six months ago. The CS has seen VERDUCCI

23   keep the pistol on his ankle. The CS stated that he/she believes VERDUCCI keeps

24   methamphetamine and money in one sock and the pistol affixed to the other ankle.

25        19.    According to the CS, VERDUCCI has sold methamphetamine as long as the CS

26   has known him. The CS has heard VERDUCCI speaking to other individuals in person and on

27   the phone about selling pound-quantities of methamphetamine. VERDUCCI has bragged to the

28   CS about owning houses in Santa Fe, New Mexico, Texas, and in Arizona near Tucson.

6

20.    The CS further stated that he/she contacts VERDUCCI and makes arrangements for narcotics transactions by calling a mobile phone used by VERDUCCI, telephone number 925-584-9081 (the SUBJECT MOBILE PHONE).  The CS believes VERDUCCI has other mobile telephones and has heard VERDUCCI speaking on other phones during their phone conversations.

### E.    Results From Administrative Subpoena Regarding The SUBJECT MOBILE PHONE.

21.    In December 2007, I reviewed a response from Sprint Spectrum Ltd. to an administrative subpoena for subscriber information for the telephone number 925-584-9081. This is the telephone number for the SUBJECT MOBILE PHONE.  The CS stated that this was the telephone number he/she used to contact VERDUCCI.  The results from the administrative subpoena indicate that the telephone number 925-584-9081 is subscribed to by ANTHONY VERDUCCI, at the SUBJECT PREMISES.

### F.    Court Authorized Pen Register Regarding The SUBJECT MOBILE PHONE.

22.    On February 12, 2008, United States Magistrate Judge Maria-Elena James authorized a pen register and trap and trace on the SUBJECT MOBILE PHONE.  In February 2008, I reviewed the authorized information regarding the approximately 159 telephone calls tracked by the pen register.  This information indicates that many of the telephone calls from or to the SUBJECT MOBILE PHONE are forwarded to or from different numbers.  The information from the pen register also indicates that the SUBJECT MOBILE PHONE regularly receives text messages.

### G.    Search Of The SUBJECT PREMISES On March 16, 2000.

23.    In February 2008, I reviewed a Concord Police Report dated March 16, 2000 regarding a prior search of the SUBJECT PREMISES.  The search was executed pursuant to a search warrant signed by Judge Coleman of the Contra Costa County Superior Court on March 10, 2000.  Law enforcement officers knocked loudly and announced their presence, but no one came to the front door of the residence.  Thereafter, law enforcement officers attempted to

7

1 forcibly enter the residence, but had difficulty entering the front door. VERDUCCI eventually

2 opened the front door. Items seized during the execution of the warrant included documents in

3 the name of ANTHONY VERDUCCI listing his address as 2112 Camelia Court, Pittsburg,

4 California (the SUBJECT PREMISES), a California Driver's License for VERDUCCI, a glass

5 smoking pipe, and a digital electronic scale. There were several vehicles located on the property.

6 The report states that approximately two to three ounces of methamphetamine was found under

7 the hood of one of the vehicles.

8 **H.**  **Shooting At The SUBJECT PREMISES On September 26, 2007.**

9  24.  On February 25, 2008, I reviewed a Pittsburg Police Report regarding reports of

10 gunfire at the SUBJECT PREMISES on September 26, 2007. The report states that the Pittsburg

11 Police interviewed an individual living near the SUBJECT PREMISES who stated that at

12 approximately 8:30 p.m., he/she was outside of his/her house when he/she heard five shots

13 coming from the backyard of the SUBJECT PREMISES. He/she went into his/her house to call

14 the police. When he/she came out of his/her house, he/she saw VERDUCCI put something into

15 the trunk of VERDUCCI's green Toyota Camry. The report states that the individual observed

16 two Hispanic males run out of VERDUCCI's house carrying white pillow cases. The Pittsburg

17 Police conducted a security sweep of the SUBJECT PREMISES. During the security sweep of

18 the SUBJECT PREMISES, officers located six bullet holes in the west exterior wall of the house.

19 Officers discovered bullet holes inside the residence, six .45 caliber shell casings near the shrub

20 line at the rear of the house, and a 50-round box of .38 Special pistol ammunition in the

21 northwest bedroom. The police report indicates there are four sheds in the back of the residence.

22 The report also indicates the lower section of the backyard contained seven or eight automobiles

23 in various states of disassembly. All efforts by the Pittsburg Police to contact VERDUCCI

24 regarding this incident have met with negative results.

25 **I.**  **Controlled Purchase Of Methamphetamine On February 5, 2008.**

26  25.  On or about February 5, 2008, at approximately 3:13 p.m., the CS participated in a

27 controlled purchase of methamphetamine from VERDUCCI at my direction and under the

28 supervision of law enforcement.

8

26.     On or about February 5, 2007 at approximately 2:52 p.m., the CS contacted VERDUCCI on the SUBJECT MOBILE PHONE at the direction of the FBI. This conversation was recorded. In this recorded call, VERDUCCI asked the CS "how many pennies do you have?" I believe, based on my training and experience, that VERDUCCI was asking the CS, how many hundreds of dollars he/she had. The CS told VERDUCCI that he/she "has 4." VERDUCCI asked if he/she had the money with him/her or if he/she needed to get it. The CS told VERDUCCI he/she had the money with him/her right now. VERDUCCI then inquired about the CS' whereabouts. The CS mentioned that he/she was with his/her boy near Evora Road. VERDUCCI told the CS that he would call him/her back in a minute. A short time after, the CS again called VERDUCCI on the SUBJECT MOBILE PHONE. In this recorded call, VERDUCCI told the CS to meet him at Tower Mart near Canal Road and Bailey Road in Pittsburg, California.

27.     A search of the CS was performed prior to the installation of the recording device on his/her person. A search of the vehicle utilized by the CS was also conducted before the controlled transaction. The CS was provided with $400 to purchase methamphetamine and given instructions on how to conduct the transaction.

28.     At approximately 3:00 p.m. on the same date, Detective Leslie Severe observed VERDUCCI leaving Camelia Court, Pittsburg in the TAN JEEP. At approximately 3:08 p.m., I observed the CS parking at the Tower Mart on Bailey Road. I observed the CS park next to a gas pump. At approximately 3:09 p.m., I observed VERDUCCI park the TAN JEEP next to a gas pump at the Tower Mart near the CS. At approximately 3:10 p.m., I observed VERDUCCI and the CS walking into the Tower Mart. At approximately 3:15 p.m., I observed the CS and VERDUCCI leaving the Tower Mart.

29.     Upon returning to the debriefing location, the CS was once again searched. A plastic bag of methamphetamine wrapped in a napkin was taken from his/her person and later placed into evidence. The CS told me he/she met VERDUCCI at the Tower Mart. The CS indicated that he/she arrived at the Tower Mart and parked next to a gas pump. Thereafter, VERDUCCI arrived at the Tower Mart and parked next to a gas pump near the CS vehicle. The

1   CS stated VERDUCCI was driving a tan Jeep. Thereafter, the CS and VERDUCCI walked into
2   Tower Mart to purchase gasoline. VERDUCCI and the CS then walked out of the Tower Mart
3   and started to pump gasoline into their vehicles. VERDUCCI instructed the CS to place the $400
4   for the methamphetamine in the center console of his Jeep. After the CS placed the $400 in
5   VERDUCCI's Jeep, the CS noticed VERDUCCI standing next to his Jeep holding something
6   wrapped in paper. VERDUCCI twisted the top of the paper. Then, VERDUCCI threw the object
7   wrapped in paper next to a gas pump. VERDUCCI told the CS to pick up the object wrapped in
8   paper. The CS picked up the object and found a plastic bag containing methamphetamine inside
9   the paper. The CS provided this baggy containing suspected methamphetamine to me.

10          **J.      Surveillance Of SUBJECT PREMISES On February 5, 2008.**
11          30.     On or about February 5, 2008, at approximately 10:00 p.m., Special Agent Doug
12  Hunt and I conducted a brief surveillance of the SUBJECT PREMISES. At that time, we noticed
13  the TAN JEEP parked in the driveway of the SUBJECT PREMISES.

14          **K.      Controlled Purchase Of Methamphetamine On February 11, 2008.**
15          31.     On or about February 11, 2008, the CS participated in a controlled purchase of
16  methamphetamine from VERDUCCI at my direction and under the supervision of law
17  enforcement.

18          32.     At my direction, the CS contacted VERDUCCI on the SUBJECT MOBILE
19  PHONE. During this telephone conversation, VERDUCCI asked the CS: "What's crackin."
20  The CS replied, "I need to work," and he/she was willing to do a "half-day." Based on the CS'
21  conversation with VERDUCCI, the CS told me that the agreement was that the CS would
22  purchase a half-ounce of methamphetamine from VERDUCCI for $750. Thereafter,
23  VERDUCCI told the CS to call him back. At approximately 2:02 p.m., the CS contacted
24  VERDUCCI again on the SUBJECT MOBILE PHONE and asked VERDUCCI what his "ETA"
25  was; VERDUCCI told the CS that he was in his car and he needed to find a scale. VERDUCCI
26  asked the CS if he/she had a scale and the CS said, "no." Approximately 30 minutes later, the
27  CS contacted VERDUCCI again, and VERDUCCI instructed the CS to meet him at the sports
28  bar of a golf course located on Golf Club Road in Pittsburg, California.

                                        10

33.    A search of the CS was performed prior to the installation of the recording device on his/her person. A search of the vehicle utilized by the CS was also conducted before the controlled transaction. The CS was provided with $750 to purchase methamphetamine and given instructions on how to conduct the transaction. At approximately 2:33 p.m., I followed the CS from the staging area.

34.    At approximately 2:42 p.m., I observed the CS driving south on Golf Club Road towards the Delta View Golf Course. At approximately 2:43 p.m., the CS was observed walking towards the club house at the golf course. At approximately 2:47 p.m., Detective John Nunes observed VERDUCCI leaving Camelia Court, Pittsburg in the TAN JEEP. At approximately 2:51 p.m., VERDUCCI was observed parking in the golf bag unloading area of the Delta View Golf Course and walking toward the club house. At approximately 2:56 p.m., VERDUCCI and the CS were observed getting back into their vehicles. At approximately 2:57 p.m., I observed VERDUCCI driving the TAN JEEP north on Golf Club Road. At this time, a green Toyota was observed in the parking lot of the Delta View Golf Course. At approximately 3:00 p.m., Detective John Nunes observed VERDUCCI arriving back at Camelia Court. At approximately 3:01 p.m., Detective John Nunes observed an unknown individual driving a green Toyota Camry. Detective Nunes observed the green Camry as it arrived at 2112 Camelia Court. Although Detective Nunes was not able to get the license plate of the Camry, I believe it is the green Toyota Camry registered to VERDUCCI and referred to as the GREEN TOYOTA.

35.    The CS and the vehicle used by the CS were once again searched upon the CS' return to the staging area. Thereafter, the CS told me that he/she walked into the sports bar at the golf course and waited for VERDUCCI. The CS told me that VERDUCCI walked into the sports bar a couple of minutes later and purchased two hotdogs. VERDUCCI gave the CS one of the hotdogs and kept the other. VERDUCCI exited the sports bar and walked towards the parking lot. In the parking lot, the CS told me that he/she handed VERDUCCI $750 wrapped in the foil from the hotdog and stated: "This is an expensive piece of foil." Thereafter, VERDUCCI handed the CS a napkin that contained a plastic bag containing methamphetamine. The CS provided me with the plastic bag containing a white crystalline substance, which was wrapped in

11

1  | a napkin. I later placed this plastic bag into evidence.

2  |     36.    The CS also told me that he/she believes VERDUCCI will sometimes send other

3  | individuals to the locations of his narcotics transactions to make sure that he is not being

4  | surveilled by law enforcement.

5  |     **L.    Surveillance Of SUBJECT PREMISES On February 15, 2008.**

6  |     37.    On or about February 15, 2008, at approximately 1:00 a.m., Special Agent Doug

7  | Hunt conducted a brief surveillance at the SUBJECT PREMISES. Special Agent Hunt told me

8  | that, in the driveway of the SUBJECT PREMISES, he observed the TAN JEEP and the GREEN

9  | TOYOTA. According to Department of Motor Vehicles records, license plate 6AUE796

10 | corresponds to a 1993 Jeep registered to Leslie Silva, 4032 Alhambra Way, Martinez, California.

11 | The information indicates the registration is valid from January 18, 2008 to January 18, 2009.

12 | Department of Motor Vehicle records also indicate that license plate 4XFW881 corresponds to a

13 | 2001 Toyota registered to ANTHONY VERDUCCI or Eric Verducci at the SUBJECT

14 | PREMISES.

15 |     38.    On or about February 16, 2008, I directed an FBI surveillance aircraft to take

16 | pictures of the SUBJECT PREMISES. I later reviewed those pictures and the accompanying

17 | video. The pictures show two vehicles in the driveway of the SUBJECT PREMISES at

18 | approximately 2:30 p.m on February 16, 2008. These two vehicles appear to be the TAN JEEP

19 | and the GREEN TOYOTA. The images of the SUBJECT PREMISES also show a shed next to

20 | the main dwelling on the SUBJECT PREMISES. There appear to at least be two other smaller

21 | sheds on the SUBJECT PREMISES. On one of side of the main dwelling there appears to be a

22 | boat. A vehicle with a car cover can also be seen in the backyard.

23 |     **M.    DMV Records Check Regarding ANTHONY TROY VERDUCCI.**

24 |     39.    On or about February 19, 2008, I reviewed Department of Motor Vehicle records

25 | for ANTHONY TROY VERDUCCI. Those records indicate that VERDUCCI currently holds a

26 | California Driver's License C2717380, with an address of 2112 Camelia Court, Pittsburg,

27 | California (the SUBJECT PREMISES).

28 | ////

12

**N.    Commercial Database Records Check Regarding ANTHONY TROY VERDUCCI.**

40.    On or about February 19, 2008, I reviewed information from a commercial database regarding VERDUCCI. This database indicates that VERDUCCI's residence is 2112 Camelia Court, Pittsburg, California (the SUBJECT PREMISES). This database also indicates that VERDUCCI may own property in Albuquerque, New Mexico and Surprise, Arizona.

**O.    DEA Lab Test Results.**

41.    On or about February 20, 2008, I reviewed Drug Enforcement Laboratory Results for the suspected methamphetamine purchased from VERDUCCI on or about February 5, 2008. These reports indicate the purchased methamphetamine had a gross weight of 39 grams and a net weight of 6.1 grams. The concentration or purity of the methamphetamine was 91.2 % with an actual drug weight of 5.5 grams.

**P.    Controlled Purchase Of Methamphetamine On February 26, 2008.**

42.    On or about February 26, 2008, the CS participated in a controlled purchase of methamphetamine from VERDUCCI at Special Agent Doug Hunt's direction and under the supervision of law enforcement.

43.    On or about February 26, 2008, Special Agent Hunt directed the CS to contact VERDUCCI to arrange for the purchase of methamphetamine. At approximately 3:15 p.m., at the direction of Special Agent Hunt, the CS contacted VERDUCCI on the SUBJECT MOBILE PHONE. The CS told VERDUCCI that he/she needed a "whole day's work." VERDUCCI told the CS it would be "1500," but that he had to go to Fry's in Concord, California first and would not be ready until approximately 5:00 p.m.

44.    At approximately 4:45 p.m. on the same date, the CS contacted VERDUCCI again on the SUBJECT MOBILE PHONE. VERDUCCI told the CS that he was in Concord, California and that he could meet the CS on Bailey Road in Concord, California. Special Agent Hunt conducted a search of the CS prior to the installation of the recording device on his/her person. Special Agent Hunt conducted a search of the vehicle utilized by the CS before the controlled transaction. The CS was provided with $1,400 to purchase methamphetamine and

13

1   given instructions on how to conduct the transaction.

2       45.    At approximately 4:55 p.m. on the same date, the CS again contacted VERDUCCI

3   on the SUBJECT MOBILE PHONE. VERDUCCI told the CS to meet him at a 99 cent store in

4   Concord, California off of Bailey Road. At approximately 5:12 p.m., Special Agent Hunt

5   observed the TAN JEEP arriving at the shopping center in Concord, California off of Bailey

6   Road. Special Agent Hunt observed a meeting between VERDUCCI, an unknown female, and

7   the CS in and around the CS' car. At approximately 5:19 p.m., the TAN JEEP left the shopping

8   center.

9       46.    The CS and the vehicle used by the CS were once again searched upon the CS'

10   return to the staging area. The CS provided Special Agent Hunt with approximately one ounce

11   of a white crystalline substance he/she had purchased from VERDUCCI. On or about February

12   28, 2008, Detective Shawn Spencer of CPD conducted a field test of the white crystalline

13   substance. The substance tested positive for the presence of methamphetamine. The substance

14   weighed approximately 27.4 grams gross weight.

15       47.    The CS told Special Agent Hunt that he/she met VERDUCCI in the parking lot of

16   the 99 cent store as directed. The CS stated that VERDUCCI was driving the TAN JEEP and

17   had a female passenger the CS knew as Rebecca Connelly. Connelly took the money for the

18   methamphetamine from the door of the CS' vehicle. VERDUCCI then got into the passenger

19   side of the CS' vehicle. VERDUCCI placed a small plastic baggie with what appeared to be

20   methamphetamine in the center console of the CS' vehicle. VERDUCCI then left the area in the

21   TAN JEEP.

22       48.    The CS also told Special Agent Hunt that he believed VERDUCCI would use the

23   TAN JEEP, the GREEN TOYOTA, and other vehicles to store methamphetamine. The CS had

24   previously noted alterations to the interiors of the GREEN TOYOTA and the TAN JEEP and

25   believed that VERDUCCI had made storage compartments inside of those vehicles.

26       49.    The CS' controlled purchase of methamphetamine from VERDUCCI on February

27   26, 2008 was recorded with covert audio and visual recording equipment.

28   ////

## IV.    LOCATIONS TO BE SEARCHED

50.    The SUBJECT PREMISES can be described as a one story detached single family home located at the end of Camelia Court, Pittsburg, California. There is a driveway that slopes from the residence downward from a two-car garage to Camelia Court. Affixed to the garage are objects that appear to be motion detectors. The house is grey with white trim. The windows on the front of the house are also trimmed in white. The front door faces Camelia Court and has a screen door over the front door. The numbers "2112" are painted on the front curb in front of the house in black. There is a brown wooden fence that appears to be attached to the garage. From an adjoining street, at least one wooden shed can be seen in the backyard of the residence along with a least one vehicle.

51.    The area to be searched includes the house described above at 2112 Camelia Court, Pittsburg, California, including rooms, attics, basements, porches, locked containers and safes, and other parts therein, as well as the surrounding grounds and driveway, any garages, carports, storage rooms, storage lockers, trash containers, and outbuildings specifically associated with, or assigned to, 2112 Camelia Court, Pittsburg, California, and any vehicles or boats parked on the property or in the driveway specifically associated with, or assigned to, 2112 Camelia Court, Pittsburg, California.

52.    The SUBJECT MOBILE PHONE is a Sprint Mobile Telephone, number (925) 584-9081, IMSI 316010022121380.

53.    The vehicles to be searched include a 1993 tan Jeep, California License Plate 6AUE796 (the TAN JEEP) and a 2001 green Toyota Camry, California License Plate 4XFW881 (the GREEN TOYOTA).

## V.    KNOWLEDGE, TRAINING, AND EXPERIENCE REGARDING NARCOTICS TRAFFICKING IN GENERAL

54.    Based on my training, experience, conversations with other experienced narcotics investigators, and my knowledge of this investigation, I know the following regarding the practices of narcotics traffickers:

55.    It is common for dealers of controlled substances to have controlled substances

15

that are packaged for sale in the place where they live or sell from, in their vehicles, or on their persons. Individuals involved in illegal trafficking of controlled substances often conceal evidence of their drug dealing in their residences and businesses, or the residences of friends or relatives, the locations used to facilitate their narcotics trafficking, and in surrounding areas to which they have ready access, such as garages, car ports, and outbuildings. They also conceal evidence in vehicles, including vehicles outside their residences or in the vicinity of their drug distribution locations, so that they have ready access to it and so that they can hide it from law enforcement, including law enforcement officers executing search warrants at their residences and businesses.

56.   Evidence also may be found in other areas to which a narcotics trafficker has ready access, such as rented storage areas and safety deposit boxes. This evidence, which is discussed in detail in the following paragraphs, includes controlled substances, paraphernalia for manufacturing, weighing, packaging, and distributing drugs, other contraband, records and evidence of drug transactions, proceeds from sales of drugs, and assets purchased with the proceeds of narcotics trafficking.

57.   Individuals involved in illegal trafficking of narcotics commonly use certain equipment and paraphernalia to manufacture, weigh, package, and prepare controlled substances for distribution. The paraphernalia includes packing materials (such as plastic baggies, balloons, wrapping paper, cellophane, condoms, and film canisters), scales to weigh controlled substances, and cutting agents and dilutants to stretch the quantity of the controlled substance so they can increase their product amount and increase profit. In processing methamphetamine, these individuals often use laboratory-type equipment. Narcotics traffickers commonly store these items on their person, in their residences, garages, outbuildings, storage areas, carports and yards, in their businesses, in the residences of friends or relatives, in abandoned residences near their drug distribution locations, in their vehicles, and in other areas to which they have ready access.

58.   Narcotics traffickers often maintain records of their transactions in a manner similar to the record keeping procedures of legitimate businesses. Even after the drugs are sold, documentary records often remain for long periods of time, sometimes years, to memorialize and

16

1    record past transactions, the status of monies owed and received, and the names and telephone

2    numbers of suppliers, customers, and co-conspirators. These records can be maintained on

3    paper, in the form of business and personal ledgers and diaries, calenders, memoranda, pay-owe

4    sheets, IOUs, miscellaneous notes, money orders, customer lists, and telephone address books.

5         59.     These records described above often reflect names, addresses and/or telephone

6    numbers of associates and co-conspirators, the sale and purchase of controlled substances,

7    customer lists, and amounts of money owed to the trafficker by his customers, and by the

8    trafficker to his suppliers. Records often indicate locations and distribution points of controlled

9    substances, and the purchase of materials, supplies, and articles used by the trafficker, and by co-

10    conspirators in the distribution of controlled substances. Records frequently include the

11    identification of properties such as real property or vehicles owned, rented, leased, controlled, or

12    otherwise utilized by the trafficker and his co-conspirators in the distribution of controlled

13    substances. These records include property rental and ownership records such as deeds of trusts

14    and lease and purchase agreements, and vehicle registration, rental, and ownership information.

15    These records are stored by narcotics traffickers on their person or in their businesses, residences

16    and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives,

17    and vehicles.

18         60.     The records described above also can exist in electronic form on computers and in

19    computer software and computer disks stored outside the computer. Further, data that is

20    processed by a computer may be written to the computer hard drive or other storage medium

21    even if the user does not intentionally save the information. For example, a computer operating

22    system may take random data out of working memory and use it to "pad" files on a computer

23    hard drive during the storage process. Electronic information can remain on computer storage

24    media, such as hard drives, for an indefinite period of time. Even when a computer user attempts

25    to delete records from a computer storage medium, the records may still exist and be recovered

26    through computer forensic techniques.

27         61.     Narcotics traffickers often travel to facilitate their trafficking. Evidence of travel

28    by persons engaged in illegal drug trafficking includes travel itineraries, airline tickets, receipts

1 related to travel such as car-rental receipts, fuel receipts, and hotel receipts, and passports and
2 visas and their contents. These items are stored by drug dealers on their person or in their
3 businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences
4 of friends or relatives, and cars.

5      62.     Narcotics traffickers often use storage facilities for drugs and other items related
6 to trafficking that are at a location away from their residences and businesses. These off-site
7 storage facilities are often commercial storage lockers and rooms. These locations are often used
8 to store or hide drugs, contraband, money, and other valuables. Narcotics traffickers often keep
9 documents and other items tending to show the existence of other stored drugs, contraband,
10 money, and other valuables in areas such as storage. Those documents and other items include
11 rental agreements, receipts, keys, notes, and maps specifically concerning off-site storage rooms,
12 lockers, and safety deposit boxes. This evidence may be found on their person or in their
13 businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences
14 of friends or relatives, and vehicles. Narcotics traffickers also often conceal evidence of drug
15 dealing in vehicles outside their residences for ready access and to prevent detection and seizure
16 by officers executing search warrants at their residences. This evidence, which is discussed in
17 detail in the preceding paragraphs, includes controlled substances, indicia such as packaging,
18 documents and electronic storage devices (and their contents) evidence tending to show the
19 distribution of narcotics (such as IOUs, pay-owe sheets, ledgers, lists of names and phone
20 numbers, telephone address books, et. cetera), digital pagers (and their contents), cellular/mobile
21 telephones (and their contents), and counter-surveillance devices.

22      63.     Other evidence of transportation, ordering, possession, and sale of drugs can
23 include the following: telephone bills to show the numbers called by the drug dealers (and hence
24 potential associates), overnight mail receipts, bank statements, deposits and withdrawal slips,
25 savings books, investment statements, loan statements, other financial institution statements, and
26 federal and state tax returns. The above items are stored by narcotics traffickers on their person
27 or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the
28 residences of friends or relatives, and vehicles.

18

64.    Narcotics traffickers usually sell their products for cash.  Because pound-quantities of methamphetamine can sell for thousands of dollars, even at the wholesale level, dealers typically have thousands of dollars in cash on hand both as proceeds of sales and to purchase their own supplies.  In addition, drug dealers often have other assets generated by their drug business, or purchased with cash earned, such as precious metals and stones, jewelry, real estate, vehicles, electronic equipment, computers, and other valuables.

65.    Evidence of significant, unexplained income of narcotics traffickers, or of the acquisition and concealment of money and assets from drug sales, can be found on banking and investment account statements, credit card account statements, cancelled checks, money orders, deposit slips, check and savings books, business and personal ledgers, accounting records, safe deposit box records and keys, federal and state tax records, rental receipts, rental agreements, utility bills, overnight mail receipts, telephone bills, loan statements, records reflecting ownership of real or personal property (such as deeds of trust or vehicle registration, insurance, and ownership information), agreements, and cancelled mail.  These records can be maintained on paper, but also can be maintained as computer data on computers and in computer software and computer disks.  Also, records can be maintained in electronic organizers.  The above items are typically kept by drug dealers on their person or in their businesses, residences and surrounding garages, outbuildings, carports, and yards, the residences of friends or relatives, and vehicles.

66.    Narcotics traffickers typically use telephones, pagers, two-way radio systems, fax machines, other communication systems, counter-surveillance devices, and related devices in their drug-trafficking activities.  These items are stored by drug dealers on their person or in their businesses, residences or cars, or the residences of friends or relatives.  These items are typically equipped with data storage capability and contain phone numbers and/or electronic messages relating to drug-trafficking activity.  Information stored in electronic form on all of the above devices can provide evidence of drug trafficking and the identity of associates.  For example, numbers stored in the telephones (such as Caller ID lists reflecting recently received calls, speed dial lists of names and/or telephone numbers, and logs of outgoing and incoming calls) can provide evidence of who the narcotics trafficker is calling, and thus the identity of potential

19

customers and suppliers. Pagers, cellular telephones, and other communication devices can
contain similar information. Also, logs from fax machines can be evidence of messages sent and
received, and the corresponding telephone numbers of possible associates and co-conspirators.
Often, telephone answering machines retain recorded messages. The incoming messages can
provide evidence of drug trafficking and the identity of associates while the outgoing message
can provide evidence of who controls the telephone line.

67.     Documents showing who owns, occupies, or controls the location being searched
also show who is responsible for the items found on the premises, including contraband and other
evidence seized. Documents and items showing the identity of the persons owning, residing in,
or controlling the area being searched include, but are not limited to, utility and telephone bills,
canceled envelopes and correspondence, outgoing answering machine messages, tax returns,
keys, deeds, and mortgage receipts.

68.     Street gang members often memorialize their gang association and narcotics
trafficking by taking, or posing for, photographs and/or videos of themselves, their associates,
their property, assets, firearms, and tattoos. For example, street gang members often take
photographs of themselves and their associates while in the process of narcotics sales and in the
areas where they traffic narcotics. They also photograph or videotape themselves while
displaying hand signs that indicated their affiliation with the street gang and thus showing
evidence of their involvement with a gang-based narcotics trafficking conspiracy. They usually
maintain these photographs and/or videos on their person or in their computers, businesses,
residences or cars, or the residences of friends or relatives.

69.     Narcotics traffickers often maintain firearms and ammunition on their person or in
their homes, businesses, cars or residences, businesses or cars of associates or family members to
protect themselves and their narcotics and assets purchased with narcotics trafficking proceeds.
They also may maintain indicia of firearms and ammunition possession such as receipts for
firearms and ammunition, boxes for firearms and ammunition, and instruction manuals and other
documentation for firearms and ammunition.

70.     As discussed above, narcotics traffickers often conceal evidence of drug dealing in

20

vehicles outside their residences for ready access and to prevent detection and seizure by officers executing search warrants at their residences. This evidence, which is discussed in detail in the preceding paragraphs, includes controlled substances, indicia such as packaging, documents and electronic storage devices (and their contents) evidence tending to show the distribution of narcotics (such as IOUs, pay-owe sheets, ledgers, lists of names and phone numbers, telephone address books, et cetera), digital pagers (and their contents), cellular/mobile telephones (and their contents), and counter-surveillance devices.

## VI.    ITEMS TO BE SEIZED

71.    Based on my training, experience, and knowledge of this investigation as set forth above, I seek authorization to seize the following items from the SUBJECT PREMISES, the TAN JEEP, and the GREEN TOYOTA:

(1)    Controlled substances, including substances containing a detectable amount of methamphetamine (regardless of form, i.e., whether wholly or partially pure, diluted in preparation for distribution, or in any preparatory form, and any other controlled substances found on the premises (regardless of form).

(2)    Equipment and paraphernalia used in the manufacture, sale, distribution, preparation for sale or distribution (e.g., dilution or cutting) or use of methamphetamine, including scales, measuring devices, balloons, plastic baggies, plastic wrap, plastic envelopes, film canisters, and cutting and adulteration agents.

(3)    Paper writings and records evidencing the manufacture, sale, distribution, or possession of controlled substances, including books, ledgers and diaries, address books and lists, buyer and seller lists, notebooks, IOUs, spreadsheets, rolodexes, telephone bills, telephone answering pads, bank and financial records, wire transfer records, evidence of off-site storage (such as storage locker receipts and safety deposit box rental records and keys), documents reflecting domestic and international travel (such as airline tickets, itineraries, and passports), and receipts showing travel (such as airline receipts, car rental receipts, hotel receipts, and fuel receipts).

(4)    United States or foreign currency derived from the sale of controlled

21

substances in violation of 21 U.S.C. §§ 841 and 846, and money wrappers, rubber bands, money containers, and money counting machines.

(5)    Financial instruments purchased with large amounts of currency derived from the sale of controlled substances, including travelers checks, bonds, stock certificates, cashiers checks, certificates of deposit, and money orders.

(6)    Records, documents and deeds reflecting the purchase or lease of real estate, vehicles, precious metals, jewelry or other items obtained with the proceeds of the sales of controlled substances.

(7)    Any boxes, bags, briefcases, suitcases or containers used to carry controlled substances.

(8)    All firearms, ammunition, and other items relating to the possession, maintenance and use of firearms, including ammunition magazines, speed loaders, ballistic vests, spare firearms parts, holsters, cleaning kits, and all other documentation which relates to the possession, sale or transfer of firearms, including but not limited to photographs, receipts for the purchase or repair of firearms, firearm containers, carrying cases, and firearm boxes.

(9)    Documents, items, and indicia tending to establish the identity of persons in control of the premises and/or things described in this warrant, including utility bills, rent receipts, cancelled checks, bank and other financial statements and records, deposit receipts, passports, driver's licenses, social security cards, mail, and other identification documents, land and lease titles, escrow papers, photographs, video and audio records, and keys.

(10)    Documents, photographs, video recordings, audio recordings, items and other indicia evidencing membership, affiliation, association or interaction with gang-based narcotics trafficking, including notes, letters, mailings, correspondence, pictures, and audio or video recordings referring to narcotics trafficking.

(11)    Devices or media that store data electronically, including personal computers, desktop computers, laptop computers, personal digital assistants ("PDAs"); mobile telephones, pagers, and answering machines (collectively, "Electronic Devices") that could contain evidence of the manufacture or distribution of controlled substances or participation in a

22

conspiracy to manufacture, distribute, and/or possess with intent to distribute controlled substances in violation of 21 U.S.C. §§ 846 and 841(a)(1), or use of such devices in violation of 21 U.S.C. § 843(b). In addition, some of these devices may be a forfeitable instrumentality of the crimes, or fruit of the crimes prohibited by 21 U.S.C. §§ 841(a)(1), 846, and 843(b).

72.     I seek authorization to search the SUBJECT MOBILE PHONE and any seized Electronic Devices for the following evidence:

(a)     Names and contact information of individuals who may be engaged in narcotics trafficking contained in any Electronic Device;

(b)     Logs of calls (which would include last numbers dialed, last calls received, time of calls and duration of calls) both to and from an Electronic Device;

(c)     Text messages both sent to and received from an Electronic Device relating to or referencing narcotics trafficking and/or referencing individuals engaged in narcotics trafficking;

(d)     Incoming and outgoing voice mail messages both to and from an Electronic Device relating to or referencing narcotics trafficking or individuals engaged in narcotics trafficking;

(e)     Browser messages and/or internet communications (e.g., e-mail; text messages) both to and from an Electronic Device relating to or referencing narcotics trafficking or individuals engaged in narcotics trafficking; and

(f)     Documents in electronic format, including Microsoft Word or Adobe PDF files, relating to or referencing narcotics trafficking or individuals engaged in narcotics trafficking

73.     This electronic evidence will be seized and searched following the approved procedures described below.

A.     Seizure and Search of Electronic Devices.

74.     Computer Hardware:  Computer hardware consists of all equipment which can collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, optical, or similar computer impulses or data.  This includes any data-processing devices (such as central

23

processing units, memory typewriters, and self-contained "laptop" or "notebook" computers);
internal and peripheral storage devices (such as fixed disks, external hard disks, floppy disk
drives and diskettes, tape drives and tapes, optical storage devices, transistor-like binary devices,
and other memory storage devices); peripheral input/output devices (such as keyboards, printers,
scanners, plotters, video display monitors, and optical readers); related communications devices
(such as modems, cables and connections, recording equipment, RAM or ROM units, acoustic
couplers, automatic dialers, speed dialers, programmable telephone dialing or signaling devices,
and electronic tone-generating devices); as well as any devices, mechanisms, or parts that can be
used to restrict access to computer hardware (such as physical keys and locks).

75.    <u>Computer Software</u>:  Computer software is digital information which can be
interpreted by a computer and any of its related components to direct the way it works.  Software
is stored in electronic, magnetic, optical, or other digital form.  It commonly includes programs
to run operating systems, applications (like word-processing, graphics, or spreadsheet programs,
utilities, compilers, interpreters, and communications programs).

76.    <u>Computer-Related Documentation</u>:  Computer-related documentation consists of
written, recorded, printed, or electronically stored material which explains or illustrates how to
configure or use computer hardware, software, or other related items.

77.    <u>Computer Passwords and Other Data Security Devices</u>:  Computer-related
documentation consists of written, recorded, printed, or electronically stored material which
explains or illustrates how to configure or use computer hardware, software, or other related
items.

78.    Based on my knowledge, training, and experience, and consultations with FBI
agents who are experienced with computers and specially-trained in computer search and seizure,
I have learned that computer hardware, software, documentation, passwords, and data security
devices may be important to a criminal investigation in two distinct respects: (1) the items
themselves may be  instrumentalities, fruits, and/or evidence of crime; and/or (2) the items may
have been used to collect and store information about crimes (in the form of electronic data).
Thus, Rule 41 of the Federal Rules of Criminal Procedure permits the government to search and

24

seize computer hardware, software, documentation, passwords, and data security devices which are: (1) instrumentalities, fruits and/or evidence of crime; and/or (2) storage devices for information about crimes. In addition, I have learned and know that searching and seizing information from computers often requires agents to seize most or all electronic storage devices (along with related peripherals) to be searched later by a qualified computer expert in a laboratory or other controlled environment. This is true because of the following:

(a)    Volume of Evidence: Computer storage devices can store the equivalent of thousands of pages of information. Additionally, a suspect may try to conceal criminal evidence; he or she might store it in random order with deceptive file names. This may require searching authorities to examine all the stored data to determine which particular files are evidence or instrumentalities of crime. This sorting process can take weeks or months, depending on the volume of data stored, and often it would be impractical to attempt this kind of data search on site.

(b)    Attempted Deletion of Electronic Records and Information: Electronic records and information can remain on computer storage media, such as computer hard drives, for an indefinite period of time. Even when a computer user attempts to delete records and information from a computer storage medium, the records and information may still exist and can be recovered through computer forensic techniques. These computer forensic techniques can be time-consuming, and often it would be impractical to do them on site.

(c)    Technical Requirements: Searching computer systems for criminal evidence is a highly technical process requiring expert skill and a properly controlled environment. For example, on-site and laboratory analysis by a qualified computer specialist is often required in order to properly retrieve and analyze electronically stored (computer) data, document and authenticate the data, and prevent the loss of the data either from accidental or deliberate programmed destruction. In many cases, the evidentiary data can be backed up to government owned computer data storage devices at the site of the search. However, there are circumstances that may necessitate the seizure and removal of the entire computer system and peripheral devices to a secure laboratory setting in order to analyze and extract the evidence. To

25

effect accurate and complete analysis may require seizure of all computer equipment and peripherals which may be interdependent, the software to operate the computer system, data security devices (including passwords) and related instruction manuals which contain directions concerning the operation of the computer system and software programs. This is true because the peripheral devices which allow users to enter or retrieve data from the storage devices vary widely in their compatibility with other hardware and software. Many system storage devices require particular input/output devices in order to read the data on the system. It is important that the computer expert be able to properly re-configure the system as it now operates in order to accurately retrieve the evidence. In addition, the computer expert needs the relevant system software (operating systems, interfaces, and hardware drivers) and any applications software which may have been used to create the data (whether stored on hard drives or on external media), as well as all related instruction manuals or other documentation and data security devices.

79.    Analysis of Electronic Data: The analysis of electronically stored data, whether performed on-site or in a laboratory or other controlled environment, may entail any or all of several different techniques. Such techniques may include, but shall not be limited to, surveying various file "directories" and the individual files they contain (analogous to looking at the outside of a file cabinet for the markings it contains and opening a drawer believed to contain pertinent files); "opening" or reading the first few "pages" of such files in order to determine their precise contents; "scanning" storage areas to discover and possibly recover recently deleted data; scanning storage areas for deliberately hidden files; or performing electronic "key-word" searches through all electronic storage areas to determine whether occurrences of language contained in such storage areas exist that are related to narcotics trafficking.

**B.    Search Procedure.**

80.    In executing this warrant, the government must begin by ascertaining whether all or part of a search of a device or media that stores data electronically (collectively, the "device") that is authorized by this warrant reasonably can be completed at the site within a reasonable time. If the search reasonably can be completed on site, the government will remove the device

26

from the site only if authorized by law because removal is (1) necessary to preserve evidence, or
(2) if the item is contraband, a forfeitable instrumentality of the crime, or fruit of the crime.

81.    If the government determines that a reasonable search as authorized in this
warrant cannot be completed at the site within a reasonable period, the government must
determine whether all or part of the authorized search can be completed by making a mirror
image of, or in some other manner duplicating, the contents of the device and then completing
the search of the mirror image off-site (e.g., at a computer crime laboratory).

82.    The government may remove from the search location a device only if the device
cannot be searched reasonably on-site, or by mirror-imaging or otherwise duplicating its contents
for off-site examination – unless authorized by law to remove the device because (1) removing
the device is necessary to preserve evidence, or (2) the device is contraband, a forfeitable
instrumentality of the crime, or fruit of the crime.  The government also may remove from the
site any related equipment (e.g., keyboards or printers) or documents (e.g., system operating or
software manuals) that reasonably appear to be necessary to conduct an off-site search of a
device in which data is stored electronically.

83.    If the government removes a device or related equipment or documents from the
place they were found in order to complete the search off-site, within ten (10) calendar days of
the removal the government must file a return with a magistrate judge that identifies with
particularity the removed device or related equipment or documents.

84.    The government must complete the off-site search of a device that agents removed
in order to search for evidence of a crime as promptly as practicable and no later than thirty (30)
calendar days after the initial execution of the warrant.  Within thirty (30) calendar days after
completing an off-site search of a device pursuant to this warrant, the government must return
any device, as well as any related equipment or document that was removed from the site in order
to complete the search, unless, under the law, the government may retain the device, equipment,
or document (1) to preserve evidence, or (2) because the device, equipment, or document is
contraband, a forfeitable instrumentality of the crime, or fruit of the crime.  Within a reasonable
period, not to exceed sixty (60) calendar days after completing the authorized search of a device,

27

the government also must use reasonable efforts to destroy – and to delete from any devices or storage media or copies that it has retained or made – copies of any data that are outside the scope of the warrant but that were copied or accessed during the search process, unless, under the law, the government may retain the copies (1) to preserve evidence, or (2) because the copies are contraband, a forfeitable instrumentality of the crime, or fruit of the crime. The deadlines set forth in this paragraph may be extended by court order for good cause shown.

85. In conducting the search authorized by this warrant, whether on-site or off-site, the government must make all reasonable efforts to use methods and procedures that will locate and expose only those categories of files, documents, or other electronically stored information that are identified with particularity in the warrant while, to the extent reasonably practicable, minimizing exposure or examination of irrelevant, privileged, or confidential files.

86. The terms of this warrant do not limit or displace any person's right to file a motion for return of property under F.R.Cr.P. 41(g). Nor does the issuance of this warrant preclude any person with any interest in any seized item from asking the government to return the item or a copy of it.

87. The government must promptly notify the judge who authorized issuance of the search warrant (or, if that judge is unavailable, to the general duty judge) if a dispute arises about rights or interests in any seized or searched item – or any data contained in any searched or seized item – and that dispute cannot be resolved informally. The government must deliver a copy of this written notification to any person known to assert any such right or interest.

## VII.   CONCLUSION

88. For the reasons stated above, I believe that probable cause exists to search the SUBJECT PREMISES, the TAN JEEP, the GREEN TOYOTA, and the SUBJECT MOBILE PHONE for evidence, fruits, and instrumentalities of violations of 21 U.S.C. § 846 (conspiracy to distribute and possess with intent to distribute narcotics); 21 U.S.C. § 841(a)(1) (manufacture, distribution, and possession with intent to distribute narcotics); and 21 U.S.C. § 843(b) (use of communication facility to facilitate drug trafficking). I also believe there is probable cause to believe that ANTHONY TROY VERDUCCI distributed a mixture and substance containing a

28

1   detectable amount of methamphetamine in violation of 21 U.S.C. § 841(a)(1) on or about

2   February 26, 2008.  I respectfully request that the Court issue the requested search warrants,

3   criminal complaint, and arrest warrant.

4   **VIII.   REQUEST TO SEAL**

5        89.     Since this investigation is continuing, disclosure of the search warrants, the arrest

6   warrant and criminal complaint, this affidavit, and/or the applications and the attachments thereto

7   could jeopardize the progress of the investigation.  Accordingly, I request that the Court issue an

8   order that the search warrants, the arrest warrant and criminal complaint, this affidavit, the

9   applications for search warrants, and all attachments thereto be filed under seal until further order

10  of this Court.

11

12                                          Lesline S. Wimbley
                                            Special Agent, Federal Bureau of Investigation
13

14  Sworn to before me this
15  ____ day of February 2008.

16
    HONORABLE MARIA ELENA JAMES   NANDOR VADAS
17  UNITED STATES MAGISTRATE JUDGE

18

19

20

21

22

23

24

25

26

27

28

                                    29